Treadwell v. McKeon.

## A. B Treadwell *et al. v.* M. A. McKeon *et al.*

1. Trustee and Cestui·qui Trust. *Misappropriation of trust funds by trustee.* A trustee can make no profit to himself by dealing with the trust fund; and if he make a purchase with it the *cestui qui trust* can elect to treat the property as a part of the trust property, and he is entitled to all the advantages of the speculation or investment thus made with the property in the name of the trustee.

2. Trust Fund. *Third person.* But if one who stands in no fiduciary relation to another appropriates the other's money, and invests it in real estate, or other property, no trust results to the owner of the money. In such case, if he purchase property with trust funds, knowing them to be such, a court of equity will fasten a lien upon

the property, and sell it in satisfaction of the amount of the trust fund so invested.

Cases cited: Hawthorne *v.* Brown, 3 Sneed, 462; Gannaway *v.* Tarpley, 1 Col., 572.

## FROM SHELBY.

Appeal from the Chancery Court. A. M. CAMPBELL, Chancellor.

L. D. McKISSICK for complainant.

YERGER, SALE & MILLER for defendant.

BURTON, Sp. J., delivered the opinion of the court.

The complainants are the administrator and heirs at law of Logan F. Henderson, and filed this bill against one Wm. McKeon, who is since deceased, and whose children and heirs at law are the present defendants.

The case is before us a second time, a re-hearing having been granted on the application of the complainants.

We have carefully re-considered the case, giving to it the examination that its importance demands, and which is called for by the very able arguments of the learned counsel who have re-argued it before us. The object of the bill is to declare a trust in favor of the complainants, and against the defendants, in the city lot mentioned in the pleadings, and which was purchased by Wm. McKeon, under the circumstances to be now presently adverted to.

On the 8th day of March, 1849, the said Lawson F. Henderson obtained judgment against one Michael Lanigan, in the Commercial and Criminal Court of Memphis, in the sum of $2,282.46 This judgment he obtained as surviving partner of the firm of Gilmer & Henderson.

On the 21st day of March, 1849, the said Wm. McKeon, as administrator of Patrick McKeon, obtained a decree against said Lanigan, in the Common Law and Chancery Court of the city of Memphis, in the sum of $1,185.85.

Such proceedings were had in said Common Law and Chancery Court, that on the 9th day of February, 1853, they each obtained a decree against the said Lanigan and others, declaring the city lot in controversy subject to the satisfaction of the debts beforementioned, and directing a sale thereof for that purpose. A sale was had, it seems, in May, 1853, but for some purpose, not material, perhaps, to be noticed, a re-sale was had in October of that year, when McKeon became the purchaser at the sum of $6,050, for which sum he executed his two notes to the Clerk and Commissioner, payable in equal instalments at six and twelve months, E. M. Yerger, Esq., the solicitor of Henderson, joining therein as a surety. Sometime after the maturity of these notes, and on 27th of December, 1855, a decree was passed in said cause, reciting the payment of the money by McKeon, and vesting the title in him as purchaser. At this time the decree in favor of Henderson amounted to the sum of $3,487.50, and that in favor of McKeon to

$1,666.92.    The money, in point of fact, was not paid
into court, but the title was obtained by McKeon in
this wise.    McKeon satisfied his own debt—he pro-
cured Mr. Yerger to execute to him a receipt for the
Henderson judgment, and the balance he paid, it is
said, in money.

The satisfaction of this decree, and the consequent
procurement of the legal title to this property by
McKeon being the circumstances on which complainants
rest their claim to a *pro tanto* equitable title to this
property, and the counsel not being agreed as to how
the facts were, we deem it proper to state our con-
clusions as to the nature of the transaction.

It is insisted here that McKeon and Yerger bought
the lot on a joint speculation.    We do not think this
argument is warranted by the proof.    Yerger states
most positively that he did not know McKeon con-
templated making the purchase until after it was made.
Some time afterwards McKeon did propose to him to be-
come interested in the purchase.    This he says he declined
to do, stating that he had no money to do so on his
own account, and had no authority from his clients to
do so on their behalf.    The reason he gives for re-
ceipting to McKeon Henderson's judgment was that he
was authorized by McKeon, verbally, to sell the lot,
and raise out of it the amount of Henderson's decree.
It is true that Mr. Yerger says McKeon told him
that he could have half of any amount that he could
sell the lot for over and above what he (McKeon)
had paid for it at the commissioner's sale.    But this
promise, whatever it would amount to, was not acted

on, for Mr. Yerger says that he immediately offered it for sale at the $6,050, and was unable to sell it at that price. It cannot then be assumed, without disregarding the evidence in this case, that Mr. Yerger, either before or after this sale, had any contract or agreement with McKeon by which he was interested in the purchase of the city lot, and the rights of the complainants result from the proper application of equitable principles to the facts hereinbefore set out. It cannot be controverted that the relation of a solicitor towards his client is fiduciary. It is a principle of equity jurisprudence everywhere recognized that if a trustee misapply the funds of the *cestui qui trust* the latter has the right, at his election, either to take the property in which the funds are wrongfully invested, or to demand re-payment from the trustee of the original fund, with interest thereon; so the same consequence would undoubtedly follow if the trustee should make the investment really for his own benefit, but in the name of a volunteer as nominal purchaser. But we do not think that a party standing in no fiduciary relation towards a fund does, by investing it in his own name, become a trustee of the substituted property.

Now, this distinction is stated, with the reason upon which it rests, by a late writer, with admirable clearness: "The trustee can make no profit to himself by dealing with the trust fund, and if he makes a purchase with it the *cestui qui trust* can elect to treat the property as a part of the trust property, and he is entitled to all the advantages of the speculation or

29—VOL. 7.

investment thus made with the property in the name of the trustee. But if one who stands in no fiduciary relation to another appropriates the other's money, and invests it in . real estate or other property, no trust results to the owner of the money. There is no doubt of this principle upon all the cases, but there is some question in the books as to what is a fiduciary relation; as where a clerk pilfered money from the store of his employer, and invested it in real estate, it was held that there was no such resulting trust, that the employer could compel a conveyance of the land." Perry on Trust, 102.

For this principle several cases are cited, and among others the case of *Hawthorne* v. *Brown,* 3 Sneed, 462. This case, decided by this court, is not distinguishable from the case in hand, except in the circumstance that the wrongful investment of the trust fund was made in that case without the knowledge or consent of the trustee, and we cannot see that that circumstance is material when it is remembered that the whole doctrine itself rests upon the principle that a court of equity requires the utmost good faith from trustees, and conclusively presumes that acts done by them in regard to the trust property are done for the benefit of the *cestui qui trust.* Of course it is not meant or intended that a person can knowingly deal with a trustee with impunity. If he purchase the trust property with a knowledge of the trust, he is bound to restore the property to the *cestui qui trust;* and furthermore, if he invest a trust fund a court of equity would fasten a lien upon the substituted prop-

erty for the amount of the trust fund. But to hold that in such case the owners of the fund could claim the substituted property itself, by way of constructive or resulting trust, would be to go farther than we are warranted in doing, either by our own decisions or by any others that we have been referred to. Indeed, the weight of authority would seem to be that where the trustee himself makes the purchase partly out of the trust fund, and partly with his own means, the *cestui qui trust* cannot claim the property purchased, but only a lien for the amount misapplied. Adams on Eq., 300; Perry on Trusts, 102. The principle of this doctrine, however, is identical with that which originates a resulting trust, and our cases declare a trust *pro tanto* in the purchased estate as against the trustee: *Gannaway et al.* v. *Tarpley,* 1 Cold., 672.

By applying these principles to the case in hand it results that Henderson's personal representative is entitled to have satisfaction of his judgment, and the accrued interest thereon, out of the city lot, and to have it sold for that purpose.

2. Upon the other question debated, viz: as to whether the decree of complainants should be credited with the payments made by McKeon to Yerger.

A careful re-consideration of this record has brought us to the conclusion that the decree of the Chancellor was right on this point. While we do not impute the least intentional bad faith to Mr. Yerger, we cannot sanction the negligence manifested by him in conducting his client's business, much less can we sanction the conduct of McKeon in taking advantage of it.

When McKeon accepted satisfaction of the Henderson judgment, he deprived Henderson of all evidence of his debt and lien upon the city lot whatever, and the accidental death of Mr. Yerger at that time would have left Henderson without remedy.

Counsel for complainants have cited authorities to the effect that the death of a client operates a revocation of the attorney's authority, without more. The books have not been furnished us, and we intimate now no opinion upon that question.

McKeon professed that he was willing and anxious to sell this property to pay the Henderson debt. He says, further, that the little controversy about the tax title probably prevented him from making the sale, and professes his willingness to have paid it at any time after this suit was settled. The further excuse that he gives for not paying is that Mr. Yerger himself informed him of Henderson's death, and advised him that he could make payment to nobody until an administrator of Henderson was appointed in Tennessee.

Now, by complainant's own showing he compromised the tax suit in December, 1857. Mr. Henderson died in March, 1858, and yet he paid as much as $900 as late as the months of March and April, 1859, more than twelve months after he compromised the law suit about the taxes, and twelve months, perhaps, after he was informed of Henderson's death, as he says Mr. Yerger informed him of that event some time in 1858. It is admitted here that Henderson's representative has never received one dollar of this money, and to de-

prive his estate of the security which it had for it on this property, and exonerate the property for McKeon's benefit, would be utterly inequitable. The judgment should be credited in McKeon's favor with whatever sum Mr. Yerger's services were fairly worth, and beyond that we think he has no right to claim the payments as against Henderson's estate. For the balance of the decree, with interest, Henderson's administrator is entitled to judgment.

A reference and report instanter may be had here if complainants desire it, and the final decree may be entered, and a sale of the property ordered to satisfy the same, unless payment is made into this court on or before the —— day of ——— next. The defendants will pay all the costs of the cause in this court and in the court below.